[Cite as *CosmetiCredit, L.L.C. v. World Fin. Network Natl. Bank*, 2014-Ohio-5301.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| CosmetiCredit, LLC, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 14AP-32 |
| v. | : | (C.P.C. No. 10CVH06-9291) |
| World Financial Network National Bank, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on November 28, 2014

*Kohrman Jackson & Krantz, and David M. Scott*, for appellant.

*Kegler, Brown, Hill & Ritter Co., LPA, Thomas W. Hill* and *Lorian E. Fuhrer*, for appellee.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiff-appellant, CosmetiCredit, LLC ("CosmetiCredit"), appeals from a final judgment of the Franklin County Court of Common Pleas in favor of defendant-appellee, World Financial Network National Bank ("World Financial"). This is a breach-of-contract action decided by partial summary judgment followed by a bench trial on remaining claims. For the reasons that follow, we affirm.

{¶ 2} World Financial is a bank chartered in the state of Delaware whose business includes the financing of private-label credit cards issued to consumers. CosmetiCredit, operating in southern California, is an intermediary that markets such private-label cards by soliciting and collecting consumer applications and transmitting them to World Financial. CosmetiCredit then collects fees associated with credit card usage and

transactions.  As indicated by its name, CosmetiCredit concentrates on consumers who seek financing for elective cosmetic surgery procedures.  CosmetiCredit accordingly enters into agreements with providers of such cosmetic surgery procedures as part of CosmetiCredit's business plan.

{¶ 3}  The transactions underlying the present dispute therefore involve consumers seeking elective cosmetic medical services (the "cardholders"), medical providers willing to furnish such services (the "providers"), CosmetiCredit and its competitors, who offer credit cards that allow consumers to finance the desired cosmetic procedures, and World Financial, which ultimately stands behind these transactions as issuer of the credit cards and holder of the resulting debt.  Each of these aspects of the transaction is supported by appropriate written agreements governing the relationship between the various parties.

{¶ 4}  In July 2006, CosmetiCredit and World Financial entered into a private-label credit card contract (the "program agreement"), under which World Financial would issue credit cards to qualified consumer-applicants who wished to finance cosmetic procedures through CosmetiCredit's network of contracting cosmetic surgeons.  Under the program agreement, World Financial explicitly reserved the right to decline to extend credit to applicants based upon various factors used to assess creditworthiness and retained sole discretion to formulate appropriate credit standards to guide such acceptance or rejection.  The credit card, if issued, could be used only to finance approved elective cosmetic procedures and not for general credit purposes.

{¶ 5}  In addition to World Financial's favorable assessment of the prospective cardholder's creditworthiness, a card application was also conditioned upon the provider of cosmetic surgery procedures having entered into a contract with CosmetiCredit that was substantially similar to and in no way conflicted or undermined the terms and conditions outlined in Schedule 2.11(b)[1] of the program agreement between CosmetiCredit and World Financial.  The provider was also required to enter into a contract with World Financial which included provisions set forth in Schedule 10.17 of the

---

[1] Paragraph 12 of Schedule 2.11(b) contains language which mirrors Section 3.4 of the program agreement between World Financial and CosmetiCredit. Paragraph 19(v) contains language which mirrors Section 4.4 of the program agreement between World Financial and CosmetiCredit.  Sections 3.4 and 4.4 are discussed in more detail in the Section Interpretation of the program agreement below.

program agreement. The program agreement also provided for certain incentives conditioned on CosmeticCredit's achievement of defined sales volume goals and set forth arrangements for handling the outstanding credit accounts in the event of final termination of the program agreement.[2] Finally, the program agreement contained a choice-of-law clause stating that it was "made under and governed by the internal laws of the State of Ohio." (R. 58, Ex. A, section 10.9.)

{¶ 6} The parties began doing business under the program agreement on or about September 2006. On January 30, 2007, the parties entered into certain amendments to the program agreement. These do not affect the current dispute. Several months later, World Financial asked for assurances from CosmetiCredit that its providers were not charging cardholders administrative fees. CosmeticCredit assured World Financial they were in compliance. World Financial then requested copies of CosmetiCredit's signed contracts with providers. On July 7, 2007, when it became apparent that CosmetiCredit could not accommodate the request, World Financial notified CosmetiCredit that it would "suspend" processing of consumer credit applications submitted by CosmetiCredit until CosmetiCredit could demonstrate compliance. In doing so, World Financial asserted that CosmetiCredit had failed to adhere to the terms of the program agreement because certain terms in the contracts between CosmetiCredit and its affiliated medical providers were not consistent with the terms of the program agreement. World Financial was concerned the contract did not contain many of the provisions reflected in Schedule 2.11(b) and consequently did not reflect the prohibition on the passing on of fees to cardholders. Other deficiencies were noted as well, including concern that Schedule 10.17 was not reflected.

{¶ 7} The 2007 suspension prompted by this dispute over fees appears to have lasted approximately two weeks, after which the parties resumed business as usual for a time. World Financial, however, remained dissatisfied with what it considered to be ongoing breaches of the program agreement based upon inadequate contracts with CosmetiCredit's medical providers. On January 29, 2009, World Financial sent

---

[2] We note that the details of the credit transactions between CosmetiCredit and World Financial are in practice somewhat more complex than set forth here. These details do not impact the present action and will not be described, particularly since the parties have entered into a voluntary agreement to seal some aspects of the record in this case in order to protect the confidentiality of their trade practices.

CosmetiCredit a "notice of termination," giving CosmetiCredit 30 days to cure the alleged breach. Unlike the events surrounding the 2007 suspension, however, the 2009 notice was not followed by any interruption in the course of business between CosmetiCredit and World Financial. The fee dispute apparently abated, and the parties again continued their course of business for some time.

{¶ 8} Finally, on December 27, 2010, World Financial sent CosmetiCredit notice that World Financial intended to terminate the program agreement entirely, effective September 30, 2011. The parties wound down their business under the program agreement accordingly and terminated their performance under the agreement on or about the time proposed in this final notice of termination.

{¶ 9} CosmetiCredit initiated the present case with a complaint filed on June 22, 2010 bringing claims for breach of contract and unjust enrichment. The complaint alleges that the July 7, 2007 suspension and January 29, 2009 notice of termination issued by World Financial were material breaches of the program agreement and damaged CosmetiCredit's ability to perform under the agreement and develop its business. CosmetiCredit also alleged that World Financial, in addition to these unwarranted notices of suspension and termination, improperly favored CosmetiCredit's competitors when issuing credit and thereby breached World Financial's obligation to perform under the program agreement in good faith. At no point in the action did CosmetiCredit assert that the ultimate and actual termination of the contract in September 2011 constituted a breach on the part of World Financial.

{¶ 10} World Financial filed an answer and counterclaim for breach of contract on September 3, 2010, followed by an amended and supplemental counterclaim on January 24, 2012. World Financial's claims are based on CosmetiCredit's failure to pay certain charges related to sales volume goals in the final year of the program agreement and CosmetiCredit's obligations under the winding-up provisions of the program agreement.

{¶ 11} On September 29, 2011, World Financial filed for summary judgment only as to CosmetiCredit's initial claims. The trial court entered an interlocutory judgment granting summary judgment for World Financial on all of CosmetiCredit's claims, and referred the counterclaims by World Financial for a bench trial before a magistrate.

Following a comprehensive trial, the magistrate rendered a decision on September 19, 2013 awarding World Financial $306,265.00 on its counterclaims based upon the termination and performance components of the program agreement, plus statutory interest in the amount of $16,907.48. The trial court then overruled CosmetiCredit's objections to the magistrate's report and adopted the magistrate's decision by entry filed December 23, 2013. This appeal ensued, and CosmetiCredit brings the following two assignments of error:

> 1.  Error in granting summary judgment despite numerous disputed issues of material fact.
>
> 2.  Error in awarding damages pursuant to a [sic] contract clauses that are actually unenforceable penalty provisions.

**STANDARD OF REVIEW**

{¶ 12} CosmetiCredit's first assignment of error addresses the trial court's grant of summary judgment on CosmetiCredit's claims for breach of contract. We review a grant of summary judgment de novo. *Capella III, L.L.C. v. Wilcox*, 190 Ohio App.3d 133, 2010-Ohio-4746, ¶ 16 (10th Dist.), citing *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 548 (2001). "De novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." *Holt v. State*, 10th Dist. No. 10AP-214, 2010-Ohio-6529, ¶ 9 (internal citations omitted). Summary judgment is appropriate where "the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Capella III* at ¶ 16, citing *Gilbert v. Summit Cty.*, 104 Ohio St.3d 660, 2004-Ohio-7108, ¶ 6. In ruling on a motion for summary judgment, the court must resolve all doubts and construe the evidence in favor of the nonmoving party. *Pilz v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-240, 2004-Ohio-4040, ¶ 8. *See also Hannah v. Dayton Power & Light Co.*, 82 Ohio St.3d 482, 485 (1998) ("Even the inferences to be drawn from the underlying facts contained in the evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the party opposing the motion."). Therefore, we

undertake an independent review to determine whether World Financial was entitled to judgment as a matter of law.

{¶ 13} In order to establish a claim for breach of contract, the plaintiff must show the existence of a contract, performance by the plaintiff under the terms of that contract, breach by the defendant, and damage or loss to the plaintiff. *Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, ¶ 27 (10th Dist.2000). The construction of a written contract is a matter of the law for the trial court to determine. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus. Because the interpretation of written contracts, including any assessment as to whether a contract is ambiguous, is a question of law, we review such issues de novo on appeal. *Sauer v. Crews*, 10th Dist. No. 12AP-320, 2012-Ohio-6257, ¶ 11. Our judicial examination of the contract begins with the fundamental objective of ascertaining and giving effect to the intent of the parties at the time they executed the agreement. *N. Coast Premier Soccer, L.L.C. v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-589, 2013-Ohio-1677, ¶ 13; *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus.

{¶ 14} If a contract is not ambiguous, it must be enforced as written. *KeyBank Natl. Assn. v. Columbus Campus, LLC*, 10th Dist. No. 11AP-920, 2013-Ohio-1243, ¶ 27. "Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzales*, 120 Ohio St.3d 47, 2008-Ohio-4838, ¶ 16. Under the parol evidence rule, a writing intended by the parties to represent the final and comprehensive embodiment of their agreement cannot be modified by evidence or earlier or contemporaneous agreements that would add to, vary, or contradict the contract. *Bellman v. Am. Internatl. Group*, 113 Ohio St.3d 323, 2007-Ohio-2071, ¶ 7. Parol evidence may be admitted, however, when an ambiguity exists, for purposes of clarifying the contractual intent of the parties. *Yoder v. Thorpe*, 10th Dist No. 07AP-225, 2007-Ohio-5866.

## INTERPRETATION OF THE PROGRAM AGREEMENT

{¶ 15} At its heart, the ongoing disagreement between the parties over the course of the five-year business relationship stemmed from CosmetiCredit's desire to pass

through card fees to the cardholders, rather than charging them to the medical providers. World Financial asserts that the plain language of the program agreement prohibited any such pass-through of fees; CosmetiCredit sees no such prohibition in the program agreement and asserts that World Financial should have been aware from the outset of the parties' business relationship that CosmetiCredit based its business plan upon passing through such fees.

{¶ 16} By way of context, we note that this dispute over where the final cost of card fees may fall is by no means novel. As a result, bank/merchant agreements barring pass-through of credit card fees (or even barring the practice of offering discounts for cash customers, which amounts to the same thing) have been the object of much litigation. *See, e.g., In re Payment Card Interchange Fee and Merchant Discount AntiTrust Litigation,* 986 F.Supp.2d 207 (E.D.N.Y.2013), and *In re Visa Check/Mastermoney AntiTrust Litigation,* 297 F.Supp.2d 503 (E.D.N.Y.2003). Unfortunately, our research has disclosed no cases in which the actual contractual language prohibiting fee pass-through is set forth under conditions comparable to the present case. We are, therefore, unable to ascertain from judicial precedent whether the language contained in the program agreement before us reflects the industry standard in such matters. Fortunately, the bare language of the program agreement is clear on this topic, and we need not refer to evidence of commercial custom or other extraneous context.

{¶ 17} The program agreement contains two relevant provisions that World Financial asserts must be read to bar the pass-through of fees to consumer cardholders. CosmetiCredit asserts to the contrary that the language chosen by the parties is too vague to invoke such a bar:

> **3.4** <u>No Special Agreements</u>. CosmetiCredit shall not, and shall require that Providers not, extract any special agreement, condition or security from Cardholders in connection with their use of a Credit Card, unless approved in advance by Bank in writing.
>
> * * *
>
> **4.4** <u>Validity of Charge Slips</u>. To the best of CosmetiCredit's knowledge: (a) As of the date any Transaction Records are presented to Bank in accordance with the provisions of this

> Agreement, each Charge, Slip relating to such Transaction Records shall represent the obligation of a Cardholder in the respective amount set forth therein for Goods sold and/or Services rendered by a Provider, together with applicable taxes, if any, and shall not involve any element of credit for any other purpose.

(R. 58, Ex. A.)

{¶ 18} We find that the plain language of Sections 3.4 and 4.4 unambiguously intend to bar such pass-through of fees by providers to cardholders. In particular, Section 3.4 of the program agreement prohibits providers from requiring cardholders to agree to special agreements or conditions in connection with their use of the credit card, such as agreeing to pay administrative fees as a condition of their using the credit card. The card charges, therefore, may not include any fees charged for the extension of credit.

{¶ 19} Because we find that the program agreement is not ambiguous in this respect, we decline to give weight–with the exception of considerations of subsequent waiver, which we discuss below—to any of the extrinsic evidence that CosmetiCredit offers to show that the intent of the parties varied materially from these terms. Whatever CosmetiCredit's intention regarding the pass-through of fees by its contracting providers, and to whatever extent CosmetiCredit believed that World Financial was aware of this business model and acquiesced to it at the outset, the unambiguous and plain language of the written agreement between the parties controls. We will first examine their conduct under the terms of that agreement to assess whether a breach occurred.

**THE 2007 SUSPENSION AND 2009 TERMINATION NOTICE**

{¶ 20} Viewing the evidence in a light most favorable to CosmetiCredit, the deposition and documentary evidence in the case establish that, prior to the July 7, 2007 "suspension" by Word Financial, CosmetiCredit was affirmatively allowing its medical providers to pass along to cardholders the fees that CosmetiCredit was charging to the medical providers. Medical providers would do this by adding the fees to the billed cost of cosmetic procedures furnished to the cardholders. As noted above, deposition testimony and some email correspondence established that there was an ongoing dispute between the parties as to these fees and that CosmetiCredit was aware of World Financial's firm objection thereto: "As a follow up to our telephone conversation on 5/2/07, you are aware

that you are not permitted to charge Cardholders any origination fees, document fees, processing fees, and/or differently titled fees of a similar nature. Legal has asked us to ensure that, as of the start of Business Day 5/9/07, you are not, and you have ensured that all Providers are not, charging any of these fees. Our agreement clearly states that the Cardholder may only be charged for the Plan-approved Goods and/or Services received from a Provider." (May 8, 2007 email from Michelle Griggs-Billiar to Paul Salzman, R. 58, Ex. 5.)

{¶ 21} In the context of this dispute, CosmetiCredit furnished to World Financial a copy of its "medical finance program agreement" used to enroll medical providers in the CosmetiCredit card program. World Financial determined that this agreement did not reflect the required terms of the program agreement and thereafter unilaterally imposed a two-week suspension of credit card applications and charges until CosmetiCredit could bring its provider agreements into compliance with the program agreement. CosmetiCredit produced evidence in opposition to summary judgment to show that this unilateral suspension impacted CosmetiCredit's growth by reducing provider confidence in the CosmetiCredit private label card program. A review of the medical finance program agreement reveals it does not contain Schedule 2.11(b) paragraph 12 and paragraph 19(v), which mirror Sections 3.4 and 4.4, respectively, of the program agreement.

{¶ 22} CosmetiCredit concedes that thereafter it did not fully cease the practice of allowing medical providers to pass-through the credit card fees to consumers. The dispute simmered until, on January 29, 2009, World Financial sent a "notice of termination" threatening termination of the program agreement if CosmetiCredit did not cure, as permitted by Section 9.2(c) of contract, the stated reason of default, which was the impermissible pass-through of fees to cardholders by merchants. During this 30-day period and thereafter, World Financial did not suspend or in any way interrupt the course of business with CosmetiCredit and cardholders and ultimately never effectuated an actual contract termination based upon this notice.

{¶ 23} CosmetiCredit asserts in this case that each of the above two actions, the 2007 processing suspension and subsequent 2009 notice of termination, constituted a breach of contract by World Financial that substantially impaired CosmetiCredit's business. We agree with the trial court that there remains no genuine issue of material

fact that there was any actionable breach of the express terms of the program agreement by World Financial on these occasions.

{¶ 24} With respect to the 2007 suspension, CosmetiCredit argues that the program agreement does not permit World Financial to unilaterally suspend processing of applications. CosmetiCredit asserts that remedies and obligations under the agreement were well-defined and allowed World Financial only to give notice of the non-compliant relationship between CosmetiCredit and its providers, while allowing CosmetiCredit 30 days to cure the deficiency.

{¶ 25} Even if we were to accept, for summary judgment purposes, that the program agreement did not allow for such a suspension as means of compelling compliance, World Financial was not in breach through its actions in 2007 because CosmetiCredit's proffered applications during this period were themselves not in conformity with the terms of the program agreement and did not require performance by World Financial. Section 1.1 of the program agreement defines a cardholder applicant as a "client of any Provider", and defines "providers" as "members of CosmetiCredit's network * * * who choose to accept Credit Cards as [a] method of payment and * * * enter into binding agreements with CosmetiCredit to participate in the Plan established under this Agreement pursuant to those provisions of this Agreement that affect such providers." (R. 58, Ex. A.) The program agreement goes on to state in Section 2.11(b) that "[i]n order for a member of CosmetiCredit's network to become a Provider * * * such member must enter into a binding agreement with CosmetiCredit that does not conflict with or undermine those in Schedule 2.11(b) * * * ."[3] (R. 58, Ex. A).

{¶ 26} Under these sections, World Financial needed only process applications by potential cardholders who were clients of qualified "Providers" as defined by the agreement. CosmetiCredit's providers had not executed contracts that complied with the program agreement and, therefore, did not qualify. A material breach of contract by one party generally discharges the non-breaching party from performance of the contract. *Nious v. Griffin Constr., Inc.*, 10th Dist. No. 03AP-980, 2004-Ohio-4103, ¶ 15-17. World

---

[3] We note for purposes of clarity that *Schedule* 2.11 and *Section* 2.11 are different parts of the program agreement. Schedule 2.11(b) is essentially a sample form for the approved contract between CosmetiCredit and its medical providers. Schedule 2.11(b)(12) and (b)(19)(v) track the above-quoted Sections 3.4 and 4.4 of the program agreement, which bar pass-through of card fees by providers.

Financial's refusal to process non-conforming applications during the two-week suspension was not a breach of the program agreement because it was excused by CosmetiCredit's refusal to secure the proper agreements with its providers.

{¶ 27} Turning to the 2009 notice of termination, we conclude that this also did not constitute a breach by World Financial. This 30-day notice of termination, which in the event World Financial never followed through upon, did not result in any cessation of processing of applications or billing. CosmetiCredit does not, in fact, articulate any manner in which this letter of termination, other than as an irritant to the business relationship between the two parties, substantially impeded CosmetiCredit's ongoing business affairs. A claim for breach of contract requires evidence of damage or loss to the plaintiff. *Powell*, 148 Ohio App.3d 1. In the absence of any evidence of damages, the breach-of-contract claim based on the 2009 notice could not survive summary judgment.

**WAIVER**

{¶ 28} CosmetiCredit alternatively asserts that, even if the program agreement barred pass-through of card fees, World Financial expressly waived that prohibition during the course of dealing between the parties. For this proposition, CosmetiCredit relies upon an email sent by a World Financial representative, Susan Lowis, to Andrea Garai, who managed the medical provider marketing materials for CosmetiCredit. This May 5, 2008 email addressed some of the provider agreement marketing materials that had been submitted from CosmetiCredit to World Financial for review. These sample provider agreements offered various options to the medical providers, some of which involved pass-through of credit card fees to the cardholders and, thus, did not comply with the terms of the program agreement between CosmetiCredit and World Financial. Nonetheless, Lowis's email on behalf of World Financial stated that "[t]he fee option split forms are approved." (R. 102, Ex. 12.) CosmetiCredit now argues that this explicit acceptance of fee option split forms that allowed providers to pass-through credit card fees to cardholders represented a waiver by World Financial of any inconsistent terms in the program agreement and that CosmetiCredit could rely on this approval of its provider agreement forms to continue its practice of allowing providers to pass-through fees.

{¶ 29} As applied to contracts, waiver is a voluntary relinquishment of a known right otherwise exercisable by a party to the contract. *State ex rel. Wallace v. State Med.*

*Bd. of Ohio*, 89 Ohio St.3d 431, 435 (2000). When a party to a contract offers, by word or action, a waiver of certain duties under the contract, other parties who change their position as a result of the waiver may enforce the waiver. *Andrews v. Ohio State Teachers Retirement Sys.*, 62 Ohio St.2d 202, 205 (1980). The party asserting the existence of a waiver must prove the waiving party's clear, unequivocal, and decisive act to waive. *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 167 Ohio App.3d 685, 2006-Ohio-3492 (8th Dist.), ¶ 28. Whether a party's inconsistent conduct amounts to a waiver involves a factual determination to be resolved by the trier of fact. *Lamberjack v. Priesman*, 6th Dist. No. 92-OT-006 (Feb. 5, 1993); *Walker v. Holland*, 117 Ohio App.3d 775, 791 (2d Dist.1997).

{¶ 30} In the present case, we find that the email exchange by World Financial's representative is sufficient to preserve a genuine issue of material fact as to the existence of a waiver by World Financial after the May 5, 2008 email. However, the timing of the various communications and actions of the parties in this case render the presence of such a waiver moot.

{¶ 31} First, the 2007 "suspension" by World Financial occurred well before the email exchange in question. CosmetiCredit cannot, therefore, rely upon the email to demonstrate that, *as of the time of the suspension*, CosmetiCredit could rely on any alleged waiver of the program agreement terms banning pass-through of fees to cardholders. The only controlling agreement in force at that time remained the program agreement, including its terms expressly barring the pass-through of fees.

{¶ 32} Second, the later 2009 notice of termination, while it did occur after the cited email exchange, did not result in any detrimental reliance on the part of CosmetiCredit. Any waiver that preceded the notice is, therefore, irrelevant, again because CosmetiCredit cannot establish any breach or resulting damages on the part of World Financial.

{¶ 33} In summary, CosmetiCredit has pointed to no circumstances that, as of the July 7, 2007 suspension, allowed CosmetiCredit to vary its terms of performance materially from those set forth in the program agreement. Because the program agreement required that the provider agreements between CosmetiCredit and its medical providers comply with the program agreement (R. 58, Ex. A, Section 2.11), and

CosmetiCredit at this time freely admitted that it had either no agreement or inadequate agreements in place with some, if not all, of its providers, World Financial did not breach its obligation of its contract when it declined to continue processing applications that were not generated in compliance with the terms of the program agreement. Nor did World Financial breach the contact by sending a 30-day notice of termination to CosmetiCredit the following year, even assuming a preceding waiver by World Financial of the no-fee pass-through rule, because this notice of termination of itself did not constitute a breach and had no material impact upon CosmetiCredit's business.

**GOOD FAITH**

{¶ 34} Beyond the bare terms of the program agreement and subsequent performance thereunder by the parties, CosmetiCredit argues that World Financial also breached its contractual duty of good faith and fair dealing towards CosmetiCredit by systematically undermining CosmetiCredit's business and providing unfair business advantages to CosmetiCredit's competitors. CosmetiCredit asserts that World Financial breached its general duty of performance in good faith under the contract and a specific contractual obligation to "work in good faith with CosmetiCredit to develop business strategies with respect to the issuance of Credit Cards which are intended to maximize the potential of the Plan." (R. 58, Ex. A, section 2.7.)

{¶ 35} In addition to this good-faith requirement explicitly stated in the program agreement, under Ohio law "there is an implied duty of good faith and fair dealing in every contract." *Am. Contractor's Indemn. Co. v. Nicole Gas Production, Ltd.*, 10th Dist. No. 07AP-1039, 2008-Ohio-5056, ¶ 13, citing *DVCC, Inc. v. Med. College of Ohio*, 10th Dist. No. 05AP-237, 2006-Ohio-945, ¶ 20. Good faith is " 'a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.' " *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443–44 (1996), quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990); *see also Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. No. 04AP-980, 2006-Ohio-638, ¶ 97, citing *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (N.Y.App.1933) (stating that, "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the

right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing").

{¶ 36} CosmetiCredit initially argues that, because World Financial was aware from the outset that CosmetiCredit's fundamental business model was to pass-through fees, World Financial's attempts to enforce the letter of the agreement constituted some sort of bad faith. Under the law generally applicable to contracts as outlined above, a contracting party is entitled to enforce the terms of the contract as written, and bad faith could not attach to such enforcement of explicit contractual rights. " 'Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of "good faith." Although courts often refer to the obligation of good faith that exists in every contractual relation, * * * this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document.' " *Ed Schory & Sons* at 443, quoting *Kham & Nate's Shoes No. 2,* 908 F.2d at 1357. Because we have determined that, at least through the email exchange of May 5, 2008, there is no reason to assume that the parties intended to vary their performance materially from the express terms of the contract, there is no basis for a finding of bad faith in this respect.

{¶ 37} Aside from the strict enforcement of its contractual rights, CosmetiCare alleges that World Financial attempted to undermine CosmetiCredit's business and provide unfair business advantages to a direct competitor, a firm known as MedChoice. CosmetiCredit provided deposition testimony from a non-party witness, Erika Harber, who worked for a third-party credit broker doing business with both CosmetiCredit and MedChoice. This testimony described differences between the rates at which applicants were approved by World Financial depending on whether their applications were routed through MedChoice or CosmetiCredit. Harber stated that there were instances in which applicants were at first rejected when applying through CosmetiCredit and later accepted when applying through MedChoice. She also stated that applicants received lower interest rates through MedChoice.

{¶ 38} CosmetiCredit also relies on the deposition testimony of Philip Hall, a principal with MedChoice, regarding advantages furnished to MedChoice in the form of 30-day advance notice of chargebacks (credit disputes) provided to MedChoice by World

Financial. Hall testified that, while neither the program agreement between World Financial and MedChoice nor CosmetiCredit provided for such advance notice, World Financial voluntarily offered such notice only to MedChoice.

{¶ 39} Initially, we note that Harber's testimony with respect to the different treatment between MedChoice and CosmetiCredit applicants is largely based on matters outside her personal knowledge and must be given carefully limited consideration in the context of this action. Harber's testimony establishes, most importantly, that she had no personal knowledge of the program agreements between World Financial and CosmetiCredit and MedChoice respectively and could not otherwise directly tie her experience with individual applicants to the larger context of the contractual relationship between CosmetiCredit and World Financial. Even accepting, arguendo, that there was admissible evidence regarding differing treatment between World Financial and its various partners in the credit card business, there is no evidence that CosmetiCredit was not treated strictly according to the terms of the contract by World Financial. Whether MedChoice had negotiated more lenient terms, or CosmetiCredit had accepted unusually harsh terms, or even whether the terms were identical between the parties, the evidence does not show that World Financial acted otherwise than according to the terms of its contract with CosmetiCredit, which gave it, in particular, the authority to establish credit standards and sole discretion in accepting or refusing credit applicants.

{¶ 40} Finally, CosmetiCredit argues that there was differential treatment between CosmetiCredit and MedChoice at the hands of World Financial because World Financial at one point during the course of the program agreement expressed an interest in purchasing MedChoice. Beyond the fact that nothing in the program agreement required World Financial to apply the same credit criteria to CosmetiCredit applicants and those submitted by other intermediaries, such as MedChoice, there is no evidence in the record that World Financial's risk department operated with knowledge of any possible acquisition by World Financial of MedChoice or any other intermediary. While Harber offered hearsay testimony to the effect that she had heard third-hand that World Financial desired to put CosmetiCredit out of business and would seek to do so by tightening credit standards, there was no basis for admission of these hearsay statements, and the trial court properly refused to consider them.

{¶ 41} In sum, World Financial was entitled to enforce its program agreement with CosmetiCredit according to the terms of that agreement. If World Financial chose to offer more favorable terms to a competitor, or vary the terms of its agreements with other similarly situated business partners, this in and of itself does not constitute a breach of its obligation of good faith towards CosmetiCredit.

**UNJUST ENRICHMENT**

{¶ 42} CosmetiCredit supplements its contract claim with a claim for unjust enrichment. Such a claim derives from the natural law of equity. *U.S. Health Practices, Inc. v. Byron Blake, M.D., Inc.*, 10th Dist. No. 00AP-1002 (Mar. 22, 2001), citing *Loyer v. Loyer*, 6th Dist. No. H-95-068 (Aug. 16, 1996). An equitable action for unjust enrichment will not lie in the absence of fraud or bad faith when the subject of the claim is governed by an express contract. *See Natl./RS, Inc. v. Huff*, 10th Dist. No. 10AP-306, 2010-Ohio-6530, ¶ 28, citing *Kucan v. Gen. Am. Life Ins. Co.*, 10th Dist. No. 01AP-1009, 2002-Ohio-4290, ¶ 39. Because we have found that there is no remaining issue of fact regarding the bad-faith claims, and CosmetiCredit has not pursued any allegation of actual fraud, the program agreement controls. It follows that the trial court properly granted summary judgment on the unjust enrichment claim as it did on the contract claim.

{¶ 43} In summary, we find that the trial court did not err in granting summary judgment to World Financial on CosmetiCredit's claims for breach of contract and unjust enrichment, and CosmetiCredit's first assignment of error is overruled.

**WORLD FINANCIAL'S COUNTERCLAIMS**

{¶ 44} We now turn to CosmetiCredit's second assignment of error, which addresses the trial court's disposition of World Financial's counterclaims seeking payment of various contractual fees and performance target payments under the program agreement. Although this aspect of the appeal addresses the outcome of a trial on the merits rather than summary judgment, there is little dispute regarding the weight of the evidence heard at trial. The issue is once again a legal interpretation of the contractual rights of the parties, which we undertake de novo.

{¶ 45} These claims fees consist generally of two components: a claim for $25,000 pursuant to Schedule 1.1(c) of the program agreement for failure to meet certain performance targets in the fifth year of the contract and liquidation fees related to

termination of the contract under Schedules 9.5 and 9.6 of the agreement. CosmetiCredit does not generally dispute the amounts involved or computations undertaken by the trial court but asserts that the contract provisions in question are impermissibly onerous liquidated damages and, therefore, unenforceable.

{¶ 46} With respect to the performance targets, the program agreement provides as follows:

> In Plan Year One, If Net Purchases do not equal or exceed the performance target of Twenty Million Dollars ($20,000,000), CosmetiCredit shall pay to Bank Twenty Thousand Dollars ($20,000). For each Plan Year thereafter, the performance target amount shall be Twenty-five Million Dollars ($25,000,000) and CosmetiCredit shall pay to Bank Twenty-five Thousand Dollars ($25,000) If the Net Purchases performance target is not met or exceeded. CosmetiCredit shall make any such payments to Bank with fifteen (15) Business Days after Bank provides to CosmetiCredit a report on Net Purchases for the Just-ended subject Plan Year.

(R. 58, Ex. A, Schedule 1.1(c).)

{¶ 47} As a question of fact, the trial court noted that CosmetiCredit never challenged or objected to the performance targets during the first three years of the program agreement, did not deny failing to meet the performance targets for the fifth year, and did not pay the $25,000 owed pursuant to Schedule 1.1, Section c, after it failed to reach the performance targets. As matter of law, the trial court found that this was an enforceable provision and fully bargained for by the parties.

{¶ 48} A liquidated-damages provision arises under a contract that apportions damages in the event of default in a set amount, and while not unenforceable on their face, such provisions are unenforceable "when the stipulated damages actually constitute a penalty." *Lakeridge Academy v. Carney*, 66 Ohio St.3d 376, 381 (1993). A party seeking to invalidate a purported liquidated-damages clause is asserting an affirmative defense and bears the burden of proof establishing that the clause generates damages in the form of a penalty, rather than reasonably apportioned damages. *Matchmaker Internatl., Inc. v. Long*, 100 Ohio App.3d 406 (9th Dist.1995); *Dykeman v. Johnson*, 83 Ohio St. 126, 135 (1910).

> Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof. (*Jones v. Stevens*, 112 Ohio St. 43 (1925), paragraph two of the syllabus, followed.)

*Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27 (1984), syllabus.

{¶ 49} Initially, we conclude that this provision does not constitute damages in any sense but, rather, merely a performance fee set to certain levels of business activity. A failure to meet the performance target did not constitute a breach by CosmetiCredit, and it is not at all clear that damages is the correct term that operated without breach and simply reflected the financial rights and obligations of the parties under continued performance of the contract by both. There was no breach under this provision of the contract until CosmetiCredit failed to make the required payments thereunder, and damages in this case stem from that aspect of CosmetiCredit's failure to perform, rather than any failure to reach sales goals.

{¶ 50} Turning to the costs associated with the liquidation of accounts upon termination of the program agreement, Section 9.5 and 9.6 of the program agreement provide as follows:

> Schedule 9.5
>
> Purchase of Accounts
>
> (a) Upon termination of this Agreement by either party or termination of the Plan in a particular state, CosmetiCredit or its designee shall have the option to purchase from Bank all unpaid and outstanding Accounts (in the case of termination in a particular state, for the purpose of this Schedule 9.5, the term "Accounts" shall refer to Accounts belonging to Cardholders with billing addresses in such state) and the listing of names and addresses of such Cardholders at one

hundred percent (100%) of the book value of the Accounts and the receivables related thereto, including without limitation all accrued finance charges and fees, whether or not bills or posted to the Accounts. All payments by CosmetiCredit or its designee pursuant to this Schedule 9.5 shall be made not later than one (1) Business Day after termination of this Agreement by wire transfer of immediately available funds to an account notified by Bank to CosmetiCredit or its designee, not less than two (2) Business Days prior to the payment date. Upon payment of the purchse price to the Bank, Bank shall assign to CosmetiCredit or its designee, without recourse, all of its right, title and interest in and to the Accounts and receivables related thereto being transferred. Furthermore, in the case of a purchase, CosmetiCredit (at its sole expense) shall notify all Cardholders that Bank is no longer the processor of their Credit Card Accounts, and CosmetiCredit and Bank shall cooperate in facilitating the transition to a new processor.

(b) In the event CosmetiCredit does not exercise its right to purchase (or have its designee purchase) the Accounts upon termination, CosmetiCredit shall continue to pay to Bank the monthly liquidation described in Schedule 9.6 below.

Schedule 9.6

Liquidation Fee

Upon the earlier to occur of (i) one party serving the other with a notice of an intent to not renew (under Section 9.1); or (ii) one party serving the other with a notice of termination (under Section 9.2 or 9.3); or (iii) the Agreement's termination where no notice is required (under Section 9.2 or 9.3), CosmetiCredit shall pay to Bank by the 10th Business Day of each month, a liquidation fee. The amount of such fee shall be determined by multiplying $5 by the number of Accounts with outstanding balances in the prior month. CosmetiCredit shall continue to pay such fee to Bank until all the Accounts have been liquidated. By way of clarification, CosmetiCredit's purchase of the Accounts under Schedule 9.5 (a) above constitutes one form of liquidation.

(R. 58, Ex. A, Schedules 9.5 and 9.6.)

{¶ 51} Schedules 9.5 and 9.6 of the program agreement, therefore, provide that, upon *termination* (not breach or default) of the contract, CosmetiCredit operated with a choice between (1) purchasing the accounts under Schedule 9.5(a), or (2) allowing the accounts to remain with the bank and paying an ongoing liquidation fee under Schedule 9.6

{¶ 52} We agree with the trial court that this liquidation fee did not represent damages but, rather, an agreed-upon service fee for the bank for World Financial to continue to service the accounts after termination of the program agreement. There was no breach in this case, and the termination of the contract was effectuated under agreed contractual terms, albeit at World Financial's initiative. Schedules 9.5 and 9.6 operated without any predicate of default on the part of either party. In effect, World Financial in this case sought through its counterclaim to recover fees owed to it under CosmetiCredit's ongoing obligations pursuant to the program agreement. These obligations remained enforceable even after the parties had wound down their principal business together. The ongoing account service fees are not liquidated damages.

{¶ 53} In addition, we conclude that, even if considered as liquidated damages, the Schedule 9.5 and 9.6 fees are neither unconscionable nor unenforceable under *Samson Sales*.

{¶ 54} We accordingly find that the trial court's decision granting damages after trial in favor of World Financial is supported by the weight of the evidence and correct as a matter of law. CosmetiCredit's second assignment of error is overruled.

{¶ 55} In conclusion, CosmetiCredit's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed in all respects.

*Judgment affirmed.*

CONNOR and O'GRADY, JJ., concur.

————————————