[Cite as *Campbell v. 1 Spring, L.L.C.*, 2020-Ohio-3190.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Robert W. Campbell, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 19AP-368 |
| v. | : | (C.P.C. No. 15CV-9033) |
| 1 Spring, LLC et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellants. | : | |

D E C I S I O N

Rendered on June 4, 2020

**On brief:** *Hrabcak & Company, L.P.A., Michael Hrabcak*, and *Benjamin B. Nelson*, for appellee. **Argued:** *Benjamin B. Nelson*.

**On brief:** *Law Office of W. Evan Price, II, LLC*, and *W. Evan Price, II*, for appellants. **Argued:** *W. Evan Price, II*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendants-appellants, 1 Spring, LLC ("1 Spring"), James R. Horner, and Samuel Horner (collectively, "appellants") appeal from an order of the Franklin County Court of Common Pleas awarding damages to plaintiff-appellee, Robert W. Campbell, on his claim for breach of contract. For the reasons that follow, we affirm.

**I. Facts and Procedural History**

{¶ 2} Appellants appealed a prior judgment in favor of Campbell to this court; in that appeal we found the trial court erred by relying on extrinsic evidence in determining whether the agreement between the parties was ambiguous. We reversed and remanded for further proceedings. *Campbell v. 1 Spring, LLC*, 10th Dist. No. 18AP-94, 2019-Ohio-623, ¶ 12. In our prior decision, we set forth the facts underlying the disputed contract:

James R. Horner and Samuel Horner are members of 1 Spring, which owns the building located at the southwest corner of North High Street and West Spring Street in Columbus, Ohio. On April 20, 2012, 1 Spring entered into a lease with the Lamar Companies ("Lamar") providing for an outdoor advertising structure to be placed on the building ("sign lease"). The sign lease provided that Lamar would pay 1 Spring $80,000.04 per year in monthly installments for a term of ten years. Lamar also held an option to extend the sign lease for an additional ten years after the initial term expired.

Prior to entering the sign lease, 1 Spring had obtained approval from the Columbus Downtown Commission to erect a digital sign on the building. Shortly before entering the sign lease, the Horners became aware that due to the building's location on a state highway it would be necessary to comply with state regulations regarding outdoor advertising. James contacted the Ohio Department of Transportation ("ODOT") and was advised that a sign would not be permitted on the 1 Spring building under the existing rules due to its proximity to other signs in the surrounding area, unless 1 Spring acquired all the existing advertising in the area. The ODOT employee indicated the agency would not grant a variance to allow a sign on the 1 Spring building, but also indicated the Director of ODOT had expressed interest in amending the existing rules to exclude urban business districts from the sign spacing requirements.

A business associate of James recommended he contact Campbell, who was a former chief of staff at ODOT, regarding assistance in obtaining approval for the sign. The Horners and Campbell met on April 23, 2012 to discuss the possibility of Campbell assisting in obtaining approval for the sign and compensation for such assistance. Following the meeting, the parties agreed to memorialize their agreement in writing to establish that Campbell was authorized to represent 1 Spring. The agreement was set forth in the form of a letter to Campbell signed by James as the managing partner of 1 Spring ("the agreement"), providing the following terms:

Samuel and James Horner hereby agree to pay you 10% of the gross receipts ($80K/year) from a lease that has been executed in regards to the above referenced property.

Your compensation shall be $8,000/year during the initial term of ten (10) years. The lease commences at a point in time when the sign has been erected.

> For this compensation, we are "in your hands" to facilitate the proper "permitting issues" needed for the sign with regards to the State of Ohio.
>
> If this is agreeable to you, please sign below and return to me at my email address.
>
> (Joint Ex. No. IV.)  A few days later, Campbell added a handwritten amendment to the agreement, providing as follows:
>
> In addition to the above terms and conditions, Samuel and James Horner agree to pay 10% of the gross receipts of the annual negotiated amount with Lamar Companies for the following term of 10 yrs at the end of the original 10 yr agreement. This contract is binding with 1 Spring LLC and heirs and assigns hereto.
>
> (Joint Ex. No. IV.)  The Horners initialed this amendment, indicating their approval.

*Id.* at ¶ 1-4.

{¶ 3}  On remand, the trial court issued a decision, including findings of fact and conclusions of law, concluding the agreement was a binding contract and certain terms in the agreement were ambiguous.  The court further held that Campbell performed under the agreement and appellants breached the agreement by failing to compensate Campbell.  The court subsequently issued a final judgment entry, incorporating its findings of fact and conclusions of law, holding appellants liable to Campbell for $51,764.14, plus interest, for the period through June 2019, and 10 percent of future rent revenues received from the sign lease beginning in July 2019, pursuant to the terms of the agreement.

## II. Assignment of Error

{¶ 4}  Appellants appeal and assign the following sole assignment of error for our review:

> The trial court erred by adopting conclusory findings of fact regarding the extrinsic evidence offered to explain ambiguities in the Parties' Contract that were against the manifest weight of the evidence, misinterpreting the contract based on those unsupported findings and entering judgment on Appellee's breach of contract claim based on that misinterpretation.

## III. Analysis

## A. Standard of Review

{¶ 5}    The elements of a contract include an offer, acceptance, contractual capacity, consideration, a manifestation of mutual assent, and legality of purpose. *You v. Northeast Ohio Med. Univ.*, 10th Dist. No. 17AP-426, 2018-Ohio-4838, ¶ 19.  A plaintiff asserting breach of contract must establish existence of a contract, performance by the plaintiff under the contract, breach by the defendant, and loss or damage to the plaintiff. *CosmetiCredit, LLC v. World Fin. Network Natl. Bank*, 10th Dist. No. 14AP-32, 2014-Ohio-5301, ¶ 13. "[J]udicial examination of [a] contract begins with the fundamental objective of ascertaining and giving effect to the intent of the parties at the time they executed the agreement." *Id.*  When a contract is not ambiguous, it must be enforced as written. *Id.* at ¶ 14.

{¶ 6}    A contract is ambiguous when its meaning cannot be determined from the four corners of the agreement or where the language is susceptible to two or more reasonable interpretations. *Covington v. Lucia*, 151 Ohio App.3d 409, 2003-Ohio-346, ¶ 18 (10th Dist.).  When parties to a contract dispute the meaning of language within the contract, the court must first consider the content within the four corners of the contract. *Drs. Kristal & Forche, D.D.S., Inc. v. Erkis*, 10th Dist. No. 09AP-06, 2009-Ohio-5671, ¶ 21. If the terms of the contract are clear and precise, it is not ambiguous and the court may not refer to evidence outside the contract to determine the meaning of those terms. *Id.* However, "[w]hen the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement give the plain language special meaning, extrinsic evidence can be used to ascertain the intent of the parties." *Id.* at ¶ 22.

{¶ 7}    In the present case, the trial court found the phrases "in your hands" and "permitting issues" within the agreement to be ambiguous because they were susceptible to two or more conflicting but reasonable interpretations.  (Apr. 5, 2019 Decision at 14.) The court concluded appellants relied on Campbell's experience and expertise with permitting and waiver issues and they were willing to place themselves in his hands to obtain the desired outcome—i.e., a permit for a sign on the 1 Spring building.  The court concluded Campbell had broad latitude and unlimited authority to determine the means

through which a permit for the sign would be obtained, without interference from appellants.

{¶ 8}  Appellants do not appear to dispute the trial court's conclusion that the agreement was ambiguous.  Rather, appellants challenge the trial court's determination that Campbell had unlimited authority under the agreement to determine how to obtain a permit for a sign on the 1 Spring building.  Appellants argue they only hired Campbell to obtain a waiver of the existing Ohio Department of Transportation ("ODOT") requirements and a permit to construct the sign on their building, not to obtain an amendment of ODOT's regulations.

{¶ 9}  "Whether a contract is ambiguous is a question of law. The meaning of the words in an ambiguous contract becomes a question of fact. Extrinsic evidence is admissible to ascertain the parties' intentions, and the trial court's determination will not be overturned absent an abuse of discretion."  (Internal citations omitted.) *Atelier Dist., LLC v. Parking Co. of Am., Inc.*, 10th Dist. No. 07AP-87, 2007-Ohio-7138, ¶ 17. *See also Benchmark Contrs., Inc. v. Southgate Mgt., LLC*, 10th Dist. No. 13AP-390, 2014-Ohio-1254, ¶ 41, quoting *Stoll v. United Magazine Co.*, 10th Dist. No. 03AP-752, 2004-Ohio-2523, ¶ 7 (" '[I]f a contract is ambiguous, the *meaning* of the words is a factual question and a court's interpretation will not be overturned absent an abuse of discretion.' " (Emphasis sic.)); *Ohio Historical Soc. v. Gen. Maintenance & Eng. Co.*, 65 Ohio App.3d 139, 147 (10th Dist.1989) ("The meaning of terms used in a contract, if ambiguous, is a question of fact and will not be overturned on appeal absent a showing that the trial court abused its discretion.").  An abuse of discretion occurs when a trial court's decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).  An arbitrary decision is one that lacks adequate determining principle and is not governed by any fixed rules or standard. *Porter, Wright, Morris & Arthur, LLP v. Frutta Del Mondo, Ltd.*, 10th Dist. No. 08AP-69, 2008-Ohio-3567, ¶ 11.  An unconscionable decision may be defined as one that affronts the sense of justice, decency, or reasonableness. *Id.*

{¶ 10} Appellants also argue the trial court's decision was against the manifest weight of the evidence. The trial court concluded Campbell performed under the agreement by helping facilitate a rule change that allowed appellants to construct the sign, and appellants breached the agreement by failing to compensate Campbell. Appellants claim Campbell was not a credible witness and was frequently impeached at trial using his deposition testimony. Appellants also argue Campbell had no expertise in regulatory amendments and, therefore, it was illogical for the trial court to conclude appellants would hire him to obtain a change in Ohio law.

{¶ 11} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978). An appellate court applying the manifest-weight standard weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way. *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10. "When reviewing a judgment under the civil manifest weight of the evidence standard, the court must presume that the findings of the trier of fact are correct, as the trial judge had the opportunity to view and observe the witnesses and to use those observations in weighting the credibility of the testimony." *Mayle v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-541, 2010-Ohio-2774, ¶ 39. *See also Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79-80 (1984) ("While we agree with the proposition that in some instances an appellate court is duty-bound to exercise the limited prerogative of reversing a judgment as being against the manifest weight of the evidence in a proper case, it is also important that in doing so a court of appeals be guided by a presumption that the findings of the trier-of-fact were indeed correct."). " 'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21, quoting *Seasons Coal Co.* at 80, fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-92 (1978).

**B. Evidence presented at trial**

{¶ 12} Because appellants challenge the trial court's conclusions that Campbell had unlimited authority to determine how to obtain a permit for appellants' sign and that Campbell performed under the agreement by helping facilitate a regulatory change allowing construction of the sign, we must consider the evidence presented at trial related to those issues.

**1. Initial meeting with Campbell and formulation of agreement**

{¶ 13} James Horner testified he spoke with John Keckstein of ODOT in mid-April 2012, after the Horners obtained a certificate of appropriateness to construct a sign on the 1 Spring building from the city of Columbus. Keckstein informed him the sign could not be constructed under ODOT regulations, unless appellants purchased all the existing advertising permits in the area. Keckstein also indicated the director of ODOT had been encouraged by various municipal leaders to change the permitting regulations for signs in municipal areas. James testified he thought changing Ohio law would be a "Herculean kind of effort" that would take "months, if not years" and that appellants needed to get their sign permitted as quickly as possible. (Tr. Vol. II at 365.) Samuel Horner testified a mutual acquaintance recommended contacting Campbell for assistance, because Campbell was influential with ODOT.

{¶ 14} Campbell and the Horners met on April 23, 2012, at a restaurant in the 1 Spring building. Campbell testified he thought he could help the Horners get a permit for the sign because he was familiar with ODOT and had relationships with the relevant ODOT employees. Campbell worked for a private-sector company in 2012, but had previously worked for ODOT for 14 and one-half years, ultimately serving as chief of staff to the agency director for approximately one a one-half years.

{¶ 15} James testified that during the April 23rd meeting, Campbell claimed he could get a waiver from ODOT for construction of the sign. James stated Campbell indicated "if it entailed changing the laws of Ohio, he was out" because he would not have the time required for that type of effort. (Tr. Vol. II at 368.) James claimed he would not have asked Campbell to pursue amending the law because Campbell was not an attorney. Similarly, Samuel testified that during the meeting Campbell claimed he could get approval for the sign without changing Ohio law through a waiver, variance, or non-conforming

permit within 30 to 60 days. During the meeting, James told Campbell he had been informed the sign would not be permitted without changing ODOT's regulations. Samuel testified Campbell indicated he could get the permit without changing the law, and that if changing the law was required, he would not be involved because he did not have the experience or time required to amend the law. Samuel claimed this point was discussed multiple times. Campbell testified there was no discussion with the Horners about obtaining a waiver of the existing regulations, and asserted he had never heard the term waiver used with respect to outdoor advertising permits during his time at ODOT.

{¶ 16} After the discussion at the restaurant, Campbell and the Horners went to the Horners' office in the 1 Spring building so Campbell could get copies of certain documents. While at the Horners' office, the parties worked out the terms of the written agreement. Campbell testified the Horners insisted on putting the agreement in writing. By contrast, the Horners testified Campbell asserted he needed something in writing to demonstrate to ODOT that he was representing the Horners.

{¶ 17} James testified he and Campbell jointly dictated the agreement and that the terms "in your hands" and "permitting issues" were put in quotation marks because the parties had previously discussed what those terms meant. James stated "in your hands" meant Campbell "was going to get this done from A to Z, and he is going to get us - - he is going to take it from now, and he is going to get us a permit within the next 60 days." (Tr. Vol. II at 376.) James also testified about his understanding of the term "permitting issues":

> Q: Permitting issues, the next phrase that is in quotes, what was your understanding of what that meant?
>
> A: Well, he referred to waivers. I referred to a variance. I referred to nonconforming. So there was a lot of terms that were being thrown around at that meeting at the Barrio. So I didn't know what to put in there exactly. That is why I put permitting issues, because I thought that covered everything involving getting our permits within a short period of time.
>
> Q: Did it have anything to do with changing Ohio law?
>
> A: Absolutely 100 percent not, and he said it, I said it. He said it more than once, if you got to change Ohio law, I am out. I am quoting him as I sit here, I am not making this up. I am telling you the absolute truth. He said it more than once. We said it more than once, because, again, he was not a lawyer. He

couldn't walk this thing through the [Joint Committee on Agency Rule Review] and hearings and everything else. He couldn't take it from A to Z.

We wanted him to get permits just like other corners down there were over permitted, something happened to get those other corners over permitted. I wanted him to do the same thing for us, and he said he could do that.

(Tr. Vol. II at 376-77.)

{¶ 18} Samuel agreed that James and Campbell were the primary drafters of the agreement. Samuel testified about his understanding of the disputed terms in the agreement:

Q: I was just going to ask you about two phrases. The first one is, quote/unquote, in your hands. What was your understanding of what that phrase meant?

A: We were in Bob Campbell's hands from start to finish. I was upset about the ten percent. I wanted to do the five, but my father said this is very important, and I agreed with him, the ten percent to go forward.

But I also made the point to Bob at lunch, I said, ten percent, you are doing everything, from start to finish, you are going to − - we are not doing a thing. And Bob Campbell said, I can get it done, and he agreed that it was going to be in a short period of time and that if he couldn't get it done and if Ohio law needed to be changed, he was out.

* * *

Q: The next quoted phrase is, quote/unquote, permitting issues. What was your understanding of that phrase?

A: We didn't know what the term was, but we knew, we all knew at the meeting and at lunch when we came back to our office that Bob Campbell was being hired to get us a permit, whether it be with the waiver or a variance. It had nothing to do with changing Ohio law. That is why Bob Campbell was getting hired. So the permitting issue dealt with a waiver or a variance or a nonconforming permit so that we could erect our sign.

(Tr. Vol. II at 423-25.) Samuel testified the Horners wanted to get the permit for the sign quickly, but admitted there was no reference to timing in the agreement. He further

acknowledged that any limitations on Campbell's authority could have been included in the agreement.

{¶ 19} Campbell testified that in working out the agreement, the Horners did not specify a timeframe in which they needed to obtain the permit. Campbell further testified the Horners did not indicate they were concerned about the method used to obtain a permit for the sign. When asked about the meaning of the term "permitting issues" in the agreement, Campbell responded:

> I just -- I mean, I didn't think this was that complex. All I did was I read this and thought I am going to go work -- talk with the people at ODOT and see if I can make this happen. That is what I did, and I knew he had to get a permit.

(Tr. Vol. I at 73.) On cross-examination, Campbell reiterated this understanding of the phrase:

> Q: And you understood the quoted phrase, in your hands, to mean the defendants were relying on you to get a permit, to get the permitting issues resolved at ODOT, correct?
>
> A: Correct.
>
> * * *
>
> Q: Now, you understood on April 23, you believed that permitting issues, in quote, meant that basically that you were going to get the rules changed, the laws rewritten, so they could get a permit, correct? That was your understanding?
>
> A: My understanding was that I would do whatever I could to get the permit, that I could move the process through the department to do whatever I could to get that permit, no matter what that meant.

(Tr. Vol. I at 99, 102.)

{¶ 20} The Horners testified that a few days after the initial meeting, Campbell brought the handwritten addendum extending the term of the agreement to the Horners' office, where both James and Samuel initialed the addendum. The Horners stated Campbell only remained at their office briefly that day and was in a rush because he had a meeting with Sarah Lee at ODOT.

**2. Campbell's interactions with ODOT**

{¶ 21} Campbell testified he spoke with the ODOT chief of staff and chief engineer, who indicated they did not oppose a permit for appellants' sign and suggested they believed ODOT should not be regulating advertising in downtown municipal areas.  On the evening of April 23, 2012, Campbell e-mailed the Horners to report on his initial contact with ODOT.  Campbell advised the Horners he had made some progress, but needed to research the legalities with ODOT.  Campbell indicated he was "getting some support from the top, but they have to listen to their council [sic] if laws crush us.  Then we will need to take another course of action." (Apr. 23, 2012 e-mail from Campbell, Joint Trial Ex. III.)

{¶ 22} Campbell subsequently met with Sarah Lee, the ODOT advertising device control manager, and John Keckstein, a field agent in the ODOT advertising device control department.  Lee told Campbell there had been pressure from other cities for ODOT to not interfere with advertising in municipal business districts.  Lee indicated another ODOT employee had previously drafted proposed regulatory amendments that would allow signs like the one sought by appellants to be constructed and suggested appellants could be the flagship case for adopting the amendments. Campbell testified these previously drafted amendments were "way on the back shelf" and "[n]obody was doing anything" with them. (Tr. Vol. I at 82.)  Campbell testified that as a result of his meeting with Lee, ODOT initiated the process of amending the regulations:

> So we took it off the back shelf, and brought it to the forefront, and then we had to start the process of getting the law changed. * * * It is simple. It is a couple paragraphs that had to go through [the Common Sense Initiative] and [the Joint Committee on Agency Rule Review]. And so it wasn't that complex.

(Tr. Vol. I at 83.)  Campbell testified he checked in "somewhat regularly" on the progress of the amendment.  (Tr. Vol. I at 83.)

{¶ 23} On May 1, 2012, the Horners sent a letter to ODOT requesting a waiver allowing construction of a sign on the 1 Spring building.  Samuel testified he sent the letter at Campbell's direction, and that Campbell reviewed the letter before it was sent.  In response to the letter, Lee prepared an internal memorandum about the proposed sign on the 1 Spring building.  Lee's memorandum noted one option would be to grant the requested waiver, but indicated this would be contrary to all outdoor advertising rules and

regulations and could create a problem when enforcing the rules against other non-conforming signs. As an alternative, Lee recommended amending the Ohio Administrative Code to institute business district spacing, as permitted under a state-federal agreement. The proposed amendments eliminated sign spacing requirements in areas that qualified as business districts. Lee noted the amendments would allow appellants' sign to be constructed. Lee's memorandum did not mention Campbell's involvement with appellants' request.

{¶ 24} Lee testified at trial about her meeting with Campbell. She asserted she would not have re-engaged in an effort to amend ODOT's regulations unless Campbell had discussed appellants' permit request with her. Lee testified Campbell was instrumental in getting the regulations amended. Lee further testified she was not aware of waivers being granted by ODOT for outdoor advertising.

{¶ 25} Keckstein also testified about his interactions with Campbell regarding permitting for appellants' sign:

> Q: At some point do you recall having a discussion with Mr. Campbell in regard to the property located at 185 North High Street or otherwise known as 1 Spring Street?
>
> A: Yes. I believe we had some conversations about the site. He came into the office and was wondering how we could get this thing done, basically.
>
> Q: When you say get this thing done, get it permitted or get the rule changed, or what do you mean?
>
> A: Get it permitted. What do we need to do to get it permitted?

(Tr. Vol. I at 219-20.) Keckstein characterized Campbell as the "lightning rod" to get the proposed amendments to the ODOT regulations enacted. (Tr. Vol. I at 226.)

**3. Events during summer and autumn of 2012**

{¶ 26} Samuel claimed Campbell terminated the agreement on July 25, 2012 when he called Samuel and informed him that no waiver would be granted for the sign and that it was necessary to change the law for the sign to be approved. Samuel testified Campbell told him "the law needs to be changed, I am out, I can't be involved, I am done, I can't get you waivers," and recommended the Horners contact Andrew Bremer, who managed

legislative affairs at ODOT.  (Tr. Vol. II at 442.)  Samuel stated he sent an e-mail to Bremer about the issue but received no response.

{¶ 27} Samuel testified that in August 2012, he discussed the issue with former Ohio Supreme Court Justice Andrew Douglas, who agreed to lobby for the Horners and pursue an amendment to the ODOT regulations.  Samuel testified he and James had a meeting with Douglas on August 23, 2012; at Douglas's request, the Horners asked Campbell to join the meeting so that Douglas could learn the status of Campbell's activities.  Samuel stated Campbell reiterated again at the meeting with Douglas that he would not be involved in amending the law.  Douglas and another member of his law firm subsequently represented the Horners at meetings and hearings at ODOT and the Joint Committee on Agency Rule Review ("JCARR"). Campbell testified he thought it was unnecessary for the Horners to hire Douglas as a lobbyist because JCARR was not likely to reject ODOT's proposed amendments. The proposed amendments were ultimately adopted[1] and a permit for appellants' sign was issued in December 2012.  Samuel testified the sign was constructed over approximately nine months and appellants began receiving revenue from the sign lease in September 2013.  Samuel admitted Campbell was not paid any compensation pursuant to the agreement.

## C. Evaluation of appellants' claims

### 1. Meaning of disputed terms in agreement

{¶ 28} As explained above, once a court determines a contract is ambiguous, the meaning of the disputed term or terms is a question of fact, subject to review for abuse of discretion.  The relevant clause in the agreement stated "we are 'in your hands' to facilitate the proper 'permitting issues' needed for the sign with regards to the State of Ohio."  The trial court found the phrases "in your hands" and "permitting issues" to be ambiguous.

{¶ 29} James and Campbell were primarily involved in drafting the language used in the agreement, including the disputed terms.  Campbell testified the agreement authorized him to do whatever was necessary to get approval for a sign on the 1 Spring building.  He claimed there was no discussion with the Horners about obtaining a waiver

---

[1] The regulatory amendments, which were adopted effective December 6, 2012, modified Ohio Adm.Code 5501:2-2-01 to add subsection (KK), defining a "business district," and Ohio Adm.Code 5501:2-02-02, to add subsection (A)(3)(b)(iv), providing that there was no spacing requirement between advertising devices located within a business district, with certain exceptions.

of the permit requirements and stated he was not aware of ODOT issuing waivers for outdoor advertising. By contrast, the Horners testified their discussion with Campbell focused solely on quickly obtaining a waiver of the existing permit requirements. They asserted they did not intend for Campbell to pursue amendment of ODOT's regulations, and claimed that Campbell indicated he would not be involved if approval of the sign required amending state law. However, the Horners admitted that no language limiting Campbell's authority was included in the agreement. The testimony from Lee and Keckstein tended to support Campbell's interpretation of the disputed terms, because they indicated Campbell wanted to determine what was necessary to obtain approval for the sign, rather than being narrowly focused on obtaining a waiver of the existing requirements.

{¶ 30} Under these circumstances, where there was competing credible evidence regarding the meaning of the terms used in the agreement, we cannot conclude the trial abused its discretion by finding that the phrase "we are 'in your hands' to facilitate the proper 'permitting issues' needed for the sign with regards to the State of Ohio" gave Campbell broad authority to pursue approval of the sign through whatever means he found appropriate. Appellants have failed to demonstrate the trial court's decision was arbitrary, unreasonable, or unconscionable. *See Ruehl v. Air/Pro, Inc.*, 1st Dist. No. C-040339, 2005-Ohio-1184, ¶ 7-12 (concluding trial court did not abuse its discretion by holding that contractual provision stating a terminated employee "may forfeit all or part of his accrued commissions" upon termination meant the employee forfeited commissions on orders for which the employer had not yet been paid at the time of termination, but did not forfeit previously earned commissions on orders for which the employer had been paid at the time of termination (Emphasis omitted.)). *Compare Benchmark Contrs.* at ¶ 50 (concluding it was unreasonable for trial court to resolve ambiguity in contract by finding a particular entity was a party to the contract because the face of the contract was not reasonably susceptible to that conclusion and no evidence was produced that would permit the court to determine what role, if any, the entity had in formation of the contract).

## 2. Weight of the evidence

{¶ 31} We apply a deferential standard in evaluating appellants' claim that the trial court's decision was against the manifest weight of the evidence. In reviewing the judgment, we must presume the trial court's findings of fact are correct and, where the

evidence is susceptible to more than one construction, give it the interpretation consistent with sustaining the judgment. *Eastley* at ¶ 21; *Mayle* at ¶ 39. The trial court concluded Campbell performed under the agreement by helping facilitate the regulatory amendments that ultimately allowed construction of appellants' sign on the 1 Spring building. Based on our review of the record, we find there was competent, credible evidence to support that conclusion. As explained above, we find the trial court did not abuse its discretion by concluding that the agreement gave Campbell broad authority to determine the method for obtaining approval of appellants' sign. Campbell testified he discussed with ODOT employees how to get appellants' sign approved, and those employees indicated a regulatory amendment would be necessary. Following those discussions, ODOT revived previously drafted regulatory amendments, which were ultimately enacted and allowed appellants to construct a sign on the 1 Spring building. Campbell testified he checked in to follow the progress of the amendment. Lee and Keckstein characterized Campbell's involvement as having been instrumental in motivating ODOT to undertake the regulatory amendments. Although there was conflicting evidence in this case, we cannot conclude the trial court clearly lost its way in resolving those conflicts, and thus the trial court's decision was not against the manifest weight of the evidence.

## IV. Conclusion

{¶ 32} For the foregoing reasons, we overrule appellants' sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and NELSON, JJ., concur.

_____